SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| MARICOPA-STANFIELD IRRIGATION & DRAINAGE DISTRICT, an Arizona municipal corporation; CENTRAL ARIZONA IRRIGATION AND DRAINAGE DISTRICT, an Arizona municipal corporation; and approximately two hundred landowners, | ) ) ) ) ) ) ) ) | Arizona Supreme Court No. CV-04-0385-SA |
| Petitioners, | ) ) ) | Pinal County Superior Court No. CV 2001-00924 |
| v. | ) ) | |
| THE HONORABLE KELLY MARIE ROBERTSON, JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, in and for the County of Pinal, | ) ) ) ) ) ) | **O P I N I O N** |
| Respondent, | ) ) | |
| and | ) ) | |
| JOHN E. SMITH, et al., | ) ) | |
| Respondents-Real Parties in Interest. | ) ) ) | |

Special Action from Superior Court of Pinal County
No. CV 2001-00924
The Honorable Kelly Marie Robertson

**JURISDICTION ACCEPTED; RELIEF GRANTED; ORDER VACATED; REMANDED**

---

MILLER, LaSOTA & PETERS, P.L.C.                                   Phoenix
      By    Donald M. Peters
            Susan A. Cannata
Attorneys for Maricopa-Stanfield Irrigation & Drainage District

SALMON, LEWIS & WELDON, P.L.C.                                    Phoenix
      By    Mark A. McGinnis
            M. Byron Lewis
            Richard N. Morrison
Attorneys for Central Arizona Irrigation & Drainage District

SACKS TIERNEY, P.A.                                        Scottsdale
     By    Marvin S. Cohen
Attorneys for Approximately Two Hundred Landowners

RENAUD, COOK, DRURY, MESAROS, P.A.                           Phoenix
     By    J. Gordon Cook
           Denise J. Henslee
Attorneys for John E. Smith, et al.

W. Patrick Schiffer, Chief Counsel                          Phoenix
Ryan A. Smith, Deputy Counsel
Maxine M. Becker, Deputy Counsel
Attorneys for Amicus Curiae Arizona Department of Water
Resources

ENGELMAN BERGER, P.C.                                       Phoenix
     By    William H. Anger
Attorneys for Amici Curiae Cities of Chandler, Glendale,
Goodyear, Mesa, Peoria and Scottsdale

Jane D. Alfano                                             Phoenix
Frederic L. Beeson
Attorneys for Amici Curiae Salt River Valley Water
Users' Association and Salt River Project Agricultural
Improvement and Power District

CURTIS, GOODWIN, SULLIVAN, UDALL & SCHWAB, P.L.C.       Phoenix
     By    Larry K. Udall
Attorneys for Amici Curiae Hohokam Irrigation & Drainage
District and San Carlos Irrigation & Drainage District

SOMACH, SIMMONS & DUNN                               Sacramento, CA
     By    Robert B. Hoffman
Attorneys for Amicus Curiae Central Arizona Water
Conservation District

Rodney B. Lewis, General Counsel                         Chandler
Attorney for Amicus Curiae Gila River Indian Community

Michael G. Rankin, City Attorney                          Tucson
Christopher E. Avery, Principal Assistant City Attorney
Attorneys for Amicus Curiae City of Tucson

David P. Frank, Attorney General                            Sells
Tohono O'Odham Nation

And

2

**B A L E S**, Justice

## I.

¶1      The issue presented is whether agricultural landowners have vested rights to certain irrigation water from the Central Arizona Project ("CAP").  The water is the subject of a master contract between the United States and the Central Arizona Water Conservation District ("CAWCD") and related subcontracts between these entities and the two petitioner irrigation districts.  The landowners are not parties to these agreements.  Because we hold that the landowners do not have vested rights to the CAP water in question, we vacate the trial court's contrary ruling and remand this case for entry of judgment in favor of the districts.

## II.

¶2      This litigation arose because the irrigation districts contemplate entering into a water rights settlement that would relinquish their rights to CAP water under their subcontracts with the United States and the CAWCD.

¶3      The districts are Arizona municipal corporations governed by boards of directors who in turn are elected by landowners within a district's boundaries.  Ariz. Rev. Stat. ("A.R.S.") §§ 48-2901, -2922, -2978 (2005).  Irrigation districts are specifically authorized to enter into contracts

3

with the United States for the delivery, distribution, or apportionment of water for the lands of the district. A.R.S. § 48-3092.

¶4 The districts have faced more than a decade of financial turmoil stemming from the high cost of repaying the United States for constructing the CAP to distribute irrigation water from the Colorado River. The proposed settlement would allow the districts to obtain debt relief in exchange for relinquishing their rights to CAP water under the subcontracts; they also would be able to purchase CAP water through 2030 under new agreements.

¶5 By a majority vote, landowners within each district approved the proposed relinquishment of rights to CAP water under the subcontracts. Some dissenting landowners ("landowners") filed two lawsuits, one against the districts and one against the CAWCD, alleging that they had vested rights to CAP water that could not be abrogated without their consent.

¶6 The suit against the CAWCD was removed to the United States District Court, which later dismissed it for failure to state a claim. The Ninth Circuit Court of Appeals affirmed this ruling. *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028 (9th Cir. 2005).

¶7 The suit against the districts proceeded in the superior court. The trial court granted partial summary

4

judgment in favor of the landowners, holding that they have vested rights to the CAP water governed by the subcontracts and that the districts may not alter those rights without the landowners' consent. This petition for special action followed.[1]

¶8    Because the trial court's decision is of statewide importance and the districts have no "equally plain, speedy, and adequate remedy by appeal," this Court accepted jurisdiction. Ariz. R.P. Spec. Act. 1(a), 4(a); *see also Bledsoe v. Goodfarb*, 170 Ariz. 256, 257, 823 P.2d 1264, 1266 (1991) (granting special action relief when legal issue affected water organizations statewide). We have jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution.

## III.

¶9    Three federal reclamation laws provide the statutory backdrop to this case. In 1902, Congress passed the Reclamation Act, 32 Stat. 388, to establish water reclamation projects in the western United States. In 1928, Congress passed the Boulder Canyon Project Act, 45 Stat. 1057, which provided for the construction of Hoover Dam and authorized the Secretary of the Interior ("Secretary") to contract for the storage and delivery of Colorado River water. Finally, in 1968, Congress passed the

---

[1]    In 2003, the trial court ordered the plaintiff landowners to serve all other landowners in each district. About 200 of these other landowners supported the districts in opposing the plaintiffs' claims and joined in the petition for special action.

5

Colorado River Basin Project Act, 82 Stat. 885, which provided for the construction and operation of the CAP. As a result, states and water users operate under a somewhat complicated system of intertwining federal statutes.

¶10     Critical to our analysis is the relationship between section 8 of the Reclamation Act and section 5 of the Boulder Canyon Project Act.[2] Under section 8 of the Reclamation Act, the Secretary generally must comply with state law in "the control, appropriation, use, or distribution of water" through a federal reclamation project. 43 U.S.C. § 383 (2000). Rights to water acquired under the Reclamation Act are appurtenant to the land irrigated and are measured by beneficial use. 43 U.S.C. § 372.

¶11     Section 5 of the Boulder Canyon Project Act ("BCPA"), in contrast, authorizes the Secretary to contract for the storage and delivery of water from its projects for irrigation and domestic uses. 43 U.S.C. § 617d. The statute expressly declares that "[n]o person shall have or be entitled to have the use" of such water except by a contract with the Secretary. *Id.* Section 5 of the BCPA does not mention state law and thus is in tension with the directive in section 8 of the Reclamation Act that state law shall control the recognition of water rights.

_____

[2]    The Reclamation Act and the Boulder Canyon Project Act are codified, respectively, at 43 U.S.C. §§ 372, 383 and 43 U.S.C. § 617d.

6

¶12     The United States Supreme Court addressed the relationship between these two statutes in *Arizona v. California*, 373 U.S. 546 (1963).  Arizona had sued in 1952 to resolve the allocation of Colorado River water among the states in the river's lower basin.  The Court held that Congress, in enacting the BCPA, "create[d] its own comprehensive scheme for the apportionment among California, Arizona, and Nevada of the Lower Basin's share of the mainstream waters of the Colorado River . . . ."  *Id.* at 565.

¶13     The Court also clarified the respective roles of state and federal law in controlling rights to water from the lower Colorado.  For federal reclamation projects in general, section 8 of the Reclamation Act requires the Secretary to follow state law regarding the control, use, or appropriation of water.  The Court, however, expressly rejected the argument that state law controlled the distribution of water subject to the BCPA.  *Id*. at 580-81, 584-86.  Instead, the BCPA vests the Secretary with the power, "through his § 5 contracts, both to carry out the allocation of the waters of the main Colorado River among the Lower Basin States and to decide which users within each State would get water."  *Id*. at 580.

¶14     In its subsequent decree, the Court reaffirmed the distinctive nature of Colorado River distribution and the need for secretarial contracts.  *Arizona v. California*, 376 U.S. 340 (1964).  The decree noted that, unless used for a federal reservation:

7

[M]ainstream water shall be released or delivered to water users . . . in Arizona, California, and Nevada only pursuant to valid contracts therefor made with such users by the Secretary of the Interior, pursuant to Section 5 of the Boulder Canyon Project Act or any other applicable federal statute[.]

*Id*. at 343.

¶15        Against this legal background, Congress in 1968 passed the Colorado River Basin Project Act ("CAP Act"), which, among other things, created the CAP.  In so doing, Congress carefully avoided unsettling the BCPA, stating that, unless otherwise provided, nothing in the CAP Act was to "be construed to alter, amend, repeal, modify, or be in conflict with the provisions of the" former.  43 U.S.C. § 1551(a).  The CAP Act also vests the Secretary with broad authority to administer the CAP.  *See Maricopa-Stanfield Irrigation & Drainage Dist. v. United States*, 158 F.3d 428, 438 n.18 (9th Cir. 1998) ("The Secretary's generous measure of discretion survived the Colorado River Basin Project Act . . . ."); *Cent. Ariz. Irrigation & Drainage Dist. v. Lujan*, 764 F. Supp. 582, 589 (D. Ariz. 1991) (noting the Secretary's administrative power over the CAP).

¶16        Congress further specified how water users would contract with the Secretary. 43 U.S.C. § 1524(b)(1).  The CAP Act outlines a step-by-step process under which the Secretary could contract with a state political subdivision for the repayment of CAP construction costs and the distribution of water. *Id.*  The state subdivision would, in turn, make CAP water

8

available to "users" within its boundaries through subcontracts. *Id.* The terms and conditions of the subcontracts were to be subject to the Secretary's approval and the United States could insist that it be included as a party. *Id.*

¶17     With the CAP on its way to realization, the Secretary in 1972 entered into the "master contract" with the CAWCD.[3] Under this contract, as amended in 1988, the United States agreed to construct and operate the CAP water delivery system in exchange for repayment of part of the attendant costs. Delivery of CAP water was not guaranteed, but instead was subject to availability and the Secretary's determination of the amount of Colorado River water to release for the CAP.

¶18     The United States and the CAWCD, in turn, entered into subcontracts with the districts, the "users" under the statutory scheme. Consistent with the master contract, the districts agreed that CAP water could be made available for irrigation only on lands with a "recent irrigation history," and groundwater pumping within each district's service area would be reduced by the amount of CAP water received under the

---

[3]   The CAWCD is a multi-county district created pursuant to state law for the purpose of contracting with the Secretary for CAP water. A.R.S. § 48-3703.  Its boundaries are coextensive with Maricopa, Pima, and Pinal counties, exclusive of Indian lands within these counties. *See Cent. Ariz. Water Conservation Dist. v. United States*, 32 F. Supp. 2d 1117, 1121 (D. Ariz. 1998).

9

subcontract. The master contract and the subcontracts were validated in state court proceedings intended to confirm that the agreements were properly entered into and binding on the CAWCD and the districts. Each district also entered into a "9(d) contract" to repay the United States the costs of constructing irrigation distribution systems within the district's service area.

¶19    Both the master contract and the subcontracts contemplated that CAP water would be delivered by the districts to agricultural landowners for irrigation. After the validation proceedings, each district entered into two agreements with its respective landowners. These agreements, a memorandum of understanding followed by a water service agreement, provide for the distribution of water through canals and other works constructed by and financed through the districts. The landowners, in turn, agreed to pay taxes and service fees and also agreed to convey to the districts their rights to use certain irrigation wells that were subject to grandfathered groundwater rights under state law.

¶20    The memoranda and the water service agreements did not guarantee the landowners access to CAP water; they instead allowed the districts to deliver irrigation water without specifying its source. The parties, however, expected that the districts would deliver, and the landowners would pay for, CAP

water under the water service agreements.

¶21 After the CAP was completed, the districts were unable to meet their financial obligations to the CAWCD under the subcontracts. Facing financial collapse, the districts entered into ten-year interim agreements with the CAWCD to obtain water at steeply reduced prices. This water is called "excess" because it is water left unused by other CAP users. *See* Robert Jerome Glennon, *Coattails of the Past: Using and Financing the Central Arizona Project*, 27 Ariz. St. L.J. 677, 682-88 (1995) (discussing problems of CAP financing and underutilization).

¶22 The financial pressure remained, and, in 2002, the districts agreed to a proposal under which they would relinquish their rights to CAP water under the subcontracts. In return, the districts would obtain debt relief and could enter new interim agreements to purchase water through 2030. These provisions are part of a comprehensive water settlement authorized by the Arizona Water Settlements Act, Pub. L. No. 108-451, 118 Stat. 3478 (2004).

¶23 Each district's board of directors approved the proposed settlement. By a majority vote, the landowners in each district approved the proposed relinquishment of subcontract rights to CAP water. Landowners dissenting from this result pursued litigation in state and federal court.

**IV.**

11

¶24    In granting partial summary judgment, the trial court held that the landowners have vested rights to receive CAP water (1) pursuant to the Reclamation Act of 1902 or (2) because they are third-party beneficiaries of the subcontracts between the districts, the CAWCD, and the United States.    Neither determination can be sustained.

**A.**

¶25    The trial court read *Arizona v. California* to hold that the BCPA supplements existing reclamation law.  Section 8 of the Reclamation Act, as noted above, provides that water rights obtained under the act "shall be appurtenant to the land irrigated . . . ."  43 U.S.C. § 372.  The trial court concluded that, under the water service agreements, the landowners are "contractually vested" with rights to CAP water appurtenant to their land and these rights would be infringed if the districts modified or relinquished the subcontracts.

¶26    This reasoning misapprehends the relationship between section 5 of the BCPA and section 8 of the Reclamation Act. Under the BCPA and *Arizona v. California*, entitlement to CAP water depends on a contract with the Secretary.  As the Supreme Court has explained:

> In *Arizona v. California*, we held that the [BCPA] vested in the Secretary the power to contract for project water deliveries independent of the direction of § 8 of the Reclamation Act to proceed in accordance with state law and of the admonition of § 18 of the [BCPA] not to interfere with state law.

12

*Bryant v. Yellen*, 447 U.S. 352, 370 (1980).[4]

¶27    In holding that the landowners could obtain a vested right to CAP water under section 8 of the Reclamation Act absent a contract with the Secretary, the trial court misread *Arizona v. California* and its resulting decree.  A contract with the Secretary is required to establish a right to water from the Lower Colorado River.  The landowners lack such a contract.

¶28    The landowners also argue that, once they received CAP water distributed by the districts under the interim agreements, section 8 of the Reclamation Act entitled them to continue to receive such water from the districts.  This argument cannot succeed.  Neither the landowners nor the United States was a party to the interim agreements, so those agreements cannot provide the contract necessary for the landowners to establish a right to CAP water.[5]

¶29    The landowners also cite Supreme Court cases dealing with rights to reclamation project water in settings other than

---

[4]    *Bryant* held that a 1926 amendment to the Reclamation Act limiting irrigation deliveries to 160 acres under single ownership could not apply to present perfected rights recognized in the BCPA.  447 U.S. at 355-56.  Like *Arizona v. California*, *Bryant* refused to apply the general Reclamation Act to limit specific provisions of the BCPA.  *Id.* at 368-69.

[5]    The districts also argue that they have never purchased CAP water under the subcontracts because it is too expensive, so the landowners could not have acquired any rights to such water as a result of having applied it for beneficial use.  We need not address this issue, given our holding that a contract with the Secretary is necessary to establish an entitlement to CAP water.

13

the Lower Colorado River Basin. *See, e.g., Ickes v. Fox*, 300 U.S. 82, 94-95 (1937) (dealing with the Yakima River Project). The landowners argue that, despite *Arizona v. California*, state water law should apply to create vested rights to CAP irrigation water once a reclamation project is built, a contract is issued, and the water is beneficially applied.

¶30      On this point, the landowners principally rely on *California v. United States*, 438 U.S. 645 (1978), which concerned a reclamation project in California's Central Valley. There the Court held that, under section 8 of the Reclamation Act, state law governs the control, use, and distribution of water through a federal reclamation project unless state law conflicts with a clear congressional directive. *Id.* at 674-75.

¶31      In so ruling, however, the Court reaffirmed that different rules apply to the Colorado River. The Court specifically noted that in *Arizona v. California*, it had "concluded that because of the unique size and multistate scope of the [Boulder Canyon] Project, Congress did not intend the States to interfere with the Secretary's power to determine with whom and on what terms water contracts would be made." *Id.* at 674.

¶32      The trial court's ruling that the landowners have a vested "right to perpetual use of the CAP water that is appurtenant to their land" conflicts with section 5 of the BCPA and *Arizona v. California*. Neither section 8 of the Reclamation

14

Act nor the landowners' water service agreements with the districts can substitute for a contract with the Secretary to create a vested right to CAP water.

**B.**

¶33        The landowners attempt to overcome the fact that they are not parties to a contract with the Secretary by arguing that they are third-party beneficiaries of the subcontracts between the Secretary, the CAWCD, and the districts.   A third-party beneficiary is a non-party who has the right to enforce a contract.   Restatement (Second) of Contracts § 304 (1979).

¶34        The trial court should not have entertained the third-party beneficiary argument at all because the landowners had already litigated and lost the same issue in federal court. Principles of issue preclusion bar the relitigation in state court of the landowners' status as third-party beneficiaries to the subcontracts.

¶35        After the landowners filed this suit against the districts in the Pinal County Superior Court in 2001, they filed a separate suit in the same court against the CAWCD in 2003. The CAWCD removed the second suit to the district court.   In September 2003, the district court dismissed the suit against the CAWCD on the grounds that the landowners were not third-party beneficiaries of either the master contract or the subcontracts.   While an appeal was pending in the Ninth Circuit

15

in the CAWCD case, the landowners argued in their state court suit against the districts that they were third-party beneficiaries of the subcontracts. The trial court accepted this argument in its November 2004 ruling without addressing the effect of the district court's prior ruling to the contrary.

¶36    The district court's ruling dismissing the suit against the CAWCD was a judgment for purposes of issue preclusion, even though an appeal was pending. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988) (pending appeal does not alter preclusive effect of district court judgment). The trial court, before reaching the merits, therefore should have considered whether the district court's judgment barred the landowners from relitigating their status as third-party beneficiaries.

¶37    Federal law determines the preclusive effect of a federal court judgment in state court. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001) ("[W]e have long held that States cannot give [federal] judgments merely whatever effect they would give their own judgments, but must accord them the effect that this Court prescribes."); Restatement (Second) of Judgments ("Restatement") § 87 (1982) ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court.").

¶38    Applying federal law to determine the preclusive effect of federal judgments helps maintain "the integrity of

16

federal judicial power and the coherence of the federalist judicial system." *Watkins v. Resorts Int'l Hotel & Casino*, 591 A.2d 592, 598 (N.J. 1991); *see also* Restatement § 87 cmt. a (noting that principle of finality of judgments is implicit in authority given federal courts under Articles I and III of the Constitution). Employing federal law also follows logically from the premise that preclusion is a "consequence of the procedures of the issuing court." *Watkins*, 591 A.2d at 598. This approach parallels the rule, expressed in the Full Faith and Credit Act, 28 U.S.C. § 1738, that federal courts will refer to state law in determining the preclusive effect of a state court judgment. *See Marrese v. Am. Acad. of Ortho. Surgeons*, 470 U.S. 373, 380-81 (1985).

¶39     The Supreme Court has long recognized the defensive use of issue preclusion. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). Under this doctrine, a plaintiff and its privies are barred from relitigating issues already settled in one case against a defendant party in another case. *Id*. at 329. The party asserting the bar must show that (1) the issue was litigated to a conclusion in a prior action, (2) the issue of fact or law was necessary to the prior judgment, and (3) the party against whom preclusion is raised was a party or privy to a party to the first case. *Allen v. McCurry*, 449 U.S. 90, 94-95 (1980). Each of these requirements is met here.

¶40     The landowners litigated their third-party beneficiary

17

status to a conclusion in the federal litigation against the CAWCD. They argued before the district court that they were third-party beneficiaries of the master contract and the subcontracts, and the district court's dismissal of their case for failure to state a claim constituted a judgment on the merits. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981).

¶41 Determining the landowners' third party status was essential to the federal court judgment. The district court held that the landowners had failed to state a claim because they were not third-party beneficiaries. Applying de novo review, the Ninth Circuit agreed, noting that the master contract and the subcontracts did not reflect any clear intent to recognize the landowners as intended beneficiaries entitled to enforce the agreements as third parties. *Smith*, 418 F.3d at 1038.[6]

¶42 Finally, the landowners in this state court litigation were parties or privy to parties in the federal litigation. The

---

[6] The Ninth Circuit has recognized that its case law regarding the status of irrigators as third-party beneficiaries may be at odds with *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed. Cir. 1984), which stated that members of an irrigation district could sue as third-party beneficiaries to enforce a consent decree entered by the district on their behalf. *See Orff v. United States*, 358 F.3d 1137, 1147 n.5 (9th Cir. 2004). The Supreme Court affirmed the Ninth Circuit's ruling in *Orff* without reaching the third-party beneficiary issue. *Orff v. United States*, 125 S. Ct. 2606 (2005). *H.F. Allen* is not persuasive here, because it did not involve Colorado River water governed by the BCPA and its remarks on third-party beneficiary status were

18

lead plaintiffs and counsel for all plaintiffs are the same in each action. Although the record reflects that some landowner plaintiffs were added to this action who were not also parties to the suit against the CAWCD in federal court, this fact does not alter our conclusion that issue preclusion should apply. *See Petit v. City of Chicago*, 766 F. Supp. 607, 613 (N.D. Ill. 1991) (applying issue preclusion where plaintiffs added parties in subsequent action in attempt to avoid preclusion).

¶43 The interests of any new landowner plaintiffs regarding the third party issue were identical to those of the overlapping plaintiffs in the two actions. There is no question that the new landowner plaintiffs had notice of the ongoing federal litigation and that their interests were adequately represented. Moreover, the landowners have not argued a lack of privity among the plaintiffs, and accordingly "any argument of that nature is deemed waived." *See Thorton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) (applying Oregon law of issue preclusion).

¶44 In attempting to avoid issue preclusion, the landowners instead rely on section 29 of the Restatement, which identifies various circumstances that allow a party to relitigate a previously determined issue. Because federal courts have looked to the Restatement in determining the

_____

unnecessary to its decision. *See* 749 F.2d at 1576.

19

preclusive effect of federal judgments, we will consider the landowners' arguments that certain exceptions identified in section 29 apply here. *See Montana v. United States*, 440 U.S. 147, 162–64 (1979) (citing drafts of the Restatement in determining whether to apply exceptions to the rule of preclusion).

¶45     The landowners first assert that treating the third party issue as conclusively determined would be "incompatible with an applicable scheme of administering the remedies in the actions involved," Restatement § 29(1), because it would frustrate the state legislature's purpose in creating Arizona irrigation districts to benefit their landowner members.

¶46     This argument is unconvincing. Section 29(1) of the Restatement applies when a remedial scheme limits the effect to be given to a prior determination of an issue. *Id.* cmt. c. An example would be "a statute provid[ing] that a determination is limited to the action in which it is made or . . . [is] only prima facie evidence of the facts involved . . . ." *Id.* The landowners do not identify any remedial scheme that would limit the preclusive effect of the federal court judgment.

¶47     We also do not believe that according preclusive effect to the prior federal judgment would somehow frustrate the purpose of Arizona's legislation creating irrigation districts. Nothing in the state legislation suggests any intent to make individual landowners the third-party beneficiaries of an irrigation district's contracts, either in general or with the Secretary concerning CAP water.

20

¶48    The landowners next argue that preclusion should not apply under section 29(5) of the Restatement because the prior determination may have been affected by relationships among the parties to the first action that are not present in the subsequent action. This exception applies when circumstances distinctive to the first proceeding might have influenced the outcome and the issue "could reasonably have been resolved otherwise if those circumstances were absent." *Id.* cmt. g. The landowners have not identified anything regarding the federal court proceedings that would invoke this exception.

¶49    Citing section 29(6) of the Restatement, the landowners also argue that they should be allowed to relitigate their third-party status because the federal court did not base its ruling on state law. Section 29(6) is inapposite because it applies when treating an issue as conclusively determined would either complicate the determination of issues in the subsequent action or prejudice the interests of another party who has not yet had his day in court. *Id.* cmt. h.

¶50    Moreover, the landowners are mistaken in arguing that state law should determine if they are third-party beneficiaries. Federal, not state law, controls the construction of contracts entered by the United States pursuant to a federal statute. *United States v. Seckinger*, 397 U.S. 203, 209-10 (1970); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000).

¶51    The landowners finally argue that they should be allowed to relitigate their status as third-party beneficiaries

so that their opportunity to "obtain[] reconsideration of the legal rule upon which it was based" is not "inappropriately foreclose[d]," Restatement § 29(7), or because "[o]ther compelling circumstances make it appropriate . . . ." *Id.* § 29(8). The landowners sought reconsideration of the district court's legal determination of their third-party status when they appealed to the Ninth Circuit. That the landowners were disappointed with the outcome in the federal courts is not sufficient reason to allow them to relitigate the issue in state court under Restatement section 29(7).

¶52 Nor have the landowners identified "compelling circumstances" that would justify relitigation under section 29(8) of the Restatement. This exception applies when a prior determination is discovered to have been plainly wrong, new evidence has become available that could likely lead to a different result, or other compelling circumstances show good reason for allowing a party to relitigate an issue. *Id.* cmt. j & reporter's note.

¶53 The landowners assert that the irrigation districts were created for their benefit and that only the landowners have the "right" to use CAP water on district lands. The subcontracts do not, however, recognize any entitlement on the part of individual landowners to CAP water and they do not express any intent to afford enforceable rights to non-parties

22

who might ultimately apply the water for irrigation purposes.[7]

¶54    The landowners did enter contracts with the districts for the delivery of irrigation water, namely, the memoranda of understanding and the subsequent water service agreements. These agreements, however, do not include the Secretary as a party and they do not modify the master contract or the subcontracts. They also do not purport to give the landowners any vested right to CAP water. The water service agreements, with slight variations among the districts, provide that the districts will deliver "irrigation water" without specifying its source as CAP water; the same agreements declare that the right to receive water from the districts will be appurtenant to the land, but this provision also does not identify CAP water.

¶55    With regard to landowner water rights, the water service agreements instead provide that the landowners retain the "exclusive right" to convert grandfathered groundwater irrigation rights to certain non-irrigation water rights and that, if they do so, they may regain the wells on their lands for use solely for municipal and industrial purposes. This

---

[7]    For this reason, if we were to reach the merits, we would agree with the Ninth Circuit that the landowners are not third-party beneficiaries entitled to enforce the master contract or the subcontracts. *See Klamath*, 204 F.3d at 1210-12 (holding that third-party beneficiary status does not result merely because a government contract operates to benefit identified non-parties; evidence of a clear intent to confer such status is required).

provision stands in marked contrast to the subcontracts, which are distinctly silent about any "rights" of individual landowners to acquire or use CAP water upon the conversion of their land from agricultural use.

¶56 In sum, the landowners have not identified compelling circumstances that would justify allowing them to relitigate their status as third-party beneficiaries. The federal court determination that they are not third-party beneficiaries of either the subcontracts or the master contract controls in this litigation. *See Smith*, 418 F.3d at 1036-38.

## V.

¶57 Because the landowners cannot establish an entitlement to CAP water absent a contract with the Secretary, and because they are not third-party beneficiaries to either the subcontracts or the master contract, the trial court erred in ruling that they have a vested right to CAP water. Our holding does not address what other rights, if any, the landowners may have under the agreements to which they are parties, such as any grandfathered irrigation rights or rights to use wells located on their lands for non-agricultural purposes.

¶58 This action for declaratory relief turns on the landowners' alleged vested right to CAP water. Because the landowners have no vested right to CAP water, the districts are entitled to summary judgment dismissing the second amended

24

complaint. We vacate the trial court's order granting partial summary judgment in favor of the landowners, grant the districts' request pursuant to A.R.S. § 12-341.01 for an award of attorneys' fees incurred in this special action, and remand this case to the trial court for further proceedings consistent with this opinion, including the determination of any request for an award of fees incurred in the trial court.

_____
W. Scott Bales, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice